UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
DANIELLE DINELEY,                      :
                      Plaintiff,       :
                                       :    16cv3197 (DLC)
             -v-                       :
                                       :    OPINION & ORDER
COACH, INC.,                           :
                                       :
                      Defendant.       :
                                       :
---------------------------------------X

Appearances:

For Plaintiff:
Casimir Joseph Wolnowski
Phillips & Associates, PLLC
45 Broadway, Suite 620
New York, NY 10006

For Defendant:
Jonathan Stoler
Lindsay Colvin Stone
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Fl.
New York, NY 10112

DENISE COTE, District Judge:

     Plaintiff Danielle Dineley ("Dineley") was formerly employed
by defendant Coach, Inc. ("Coach") as an Executive Assistant.
Dineley seeks back pay for hours worked in excess of forty hours
per workweek, alleging violations of the Fair Labor Standards Act
("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law
("NYLL") Articles 6 & 9.  Dineley also alleges she was
discriminated against and subjected to a hostile work environment
and constructively terminated based on her perceived or actual
disability in violation of the Americans with Disabilities Act of

1990, 42 U.S.C. § 12101, et seq. ("ADA") and the New York City Human Rights Law, as codified in the Administrative Code of the City of New York § 8-107 et seq. ("NYCHRL").

Coach moved for summary judgment on December 16, 2016, arguing that Dineley was properly classified as exempt from the FLSA and the NYLL, and that Dineley cannot establish that she was subject to a hostile work environment or constructively discharged. For the reasons that follow, Coach's motion for summary judgment is granted in part.

<u>**BACKGROUND**</u>

The following describes the evidence which is either undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted. Coach is a New York design house headquartered in New York City. During Dineley's employment, Coach had approximately 17,000 employees worldwide. Dineley was employed as an Executive Assistant at Coach from January 18, 2011, until she resigned her employment, effective September 4, 2015. Dineley was classified as an overtime exempt employee and thus was not paid overtime during her employment at Coach. Coach does not dispute that Dineley worked more than 40 hours a week, or her accounting of such hours.

Plaintiff served from January 18, 2011 to November 4, 2013 as the Executive Assistant for a Vice President of Human Resources and the second most senior member of the HR department (the "HR VP"), and a Senior Director of Human Resources (the

2

"Senior Director").  Dineley's starting base salary was $65,000, and had increased to $75,850 by November 3, 2013, when she transferred to work in the Design Department.

Dineley's job duties in HR were to support the HR VP in overall management and coordination of team activities, manage schedules for the HR VP and Senior Director, arrange travel and prepare travel expense reports, answer telephone calls, plan and coordinate meetings, and participate in human resources meetings and on special project teams.  Dineley served as a gatekeeper for emails, calls, and meeting requests for the HR VP and Senior Director.  She developed organizational/filing systems for the Senior Director.  She independently learned Coach's personnel policies in order to better advise her co-workers on Coach's policies.  Dineley was "a point person for general HR questions, especially for other [Executive Assistants] who usually reach[ed] out to [her] first."  She also helped train and "on-board" new assistants at Coach.  In her self-evaluations of her performance in 2011 and 2012, Dineley stated that she also managed temporary employees who staffed the seasonal Coach Sample Sale.  On her resume Dineley stated that during this time she handled confidential and highly sensitive information on a daily basis.

On November 4, 2013, Dineley became an Executive Assistant in Coach's Design Department.  Her salary had increased to $92,000 when she resigned from Coach.  In addition, Dineley received annual bonuses of up to $10,000 each year she worked at

Coach.

Dineley was initially assigned to support two senior
executives within the Design Department.  In about January 2014,
Dineley was assigned to support only Coach's Vice President of
Design, the second most senior executive in the Design Department
(the "Design VP").[1]  Dineley managed the Design VP's schedule and
fielded incoming emails and calls, and helped prepare travel
arrangements.  Dineley was required to use her judgment to decide
when a matter was sufficiently important that she needed to
interrupt the Design VP during meetings.  As the Design VP's
Executive Assistant, Dineley was responsible for scheduling and
coordinating the Design Department's Design Time meetings, an
important meeting at which designers would discuss their
projects.  She also helped manage and improve the Design
Department's sample sales and made sure that the Design
Department's sales at the sample sale were properly credited to
the Department.  Dineley was also responsible for monitoring and
reordering the Design Department's supplies.  She had authority
to approve expense reimbursement requests for under $100, and
requests for more than $100 that she felt did not require any
further review.

In her role as Executive Assistant, Dineley was responsible
for selecting and interviewing applicants for full-time and

---

[1] The Design VP reported to Coach's Executive Creative Director,
who in turn reported to Coach's CEO.

temporary administrative assistants and executive assistants, as well as making hiring recommendations.  The designers and executives only met with those candidates that she recommended. Dineley supervised and delegated assignments to two administrative assistants.  The administrative assistants were classified as non-exempt employees and were paid base salaries of approximately half that of Dineley's and received smaller bonuses.  The two administrative assistant's primary duties were to support multiple, less senior members of the design team, as Dineley supported the Design VP.  Dineley's self-evaluations of her performance, and her resume, stated that she managed the two administrative assistants, as do most contemporaneous company documents.[2]  Dineley drafted the assistants' performance reviews based on her own observations and feedback from the designers, and followed up by holding one-on-one meetings with the assistants to review their ratings.  She tracked the assistants' hours and had some role in deciding when they could take vacation.  In one instance, Dineley received complaints from designers about one of the assistants, and at the Design VP's direction worked with HR to prepare a "note to file."  Dineley had a one-one-one meeting with the assistant.  Per the Design VP's instruction, after the disciplinary incident, Dineley

---

[2] Dineley stated in her deposition that she didn't "actually ha[ve] any managerial authority over" the two administrative assistants.  Dineley avers in opposition to this motion that she "delegated responsibilities and projects to them based on what was told to [her] by the designers or [the Design VP]."

5

required that the two assistants check in with Dineley each
morning when they arrived, had fifteen minute "touch base"
meetings with them each morning, and a thirty minute meeting once
a month to discuss long-term projects and accomplishments.

Dinely experienced difficulties working for the Design VP
nearly from the start, which was months before she first advised
Coach of her disability.  In April 2014, Dineley met with an HR
Representative to discuss the mid-year performance review Dineley
had received from the Design VP, and reported that she was having
a "hard time" working with the Design VP.  Dineley reported to
the HR Representative that the Design VP gave conflicting
directions and took her stress out on Dineley.  From at least
April 2014, the Design VP required Dineley to interrupt her
during meetings to relay important updates, and tell her each day
when she was leaving the office for the day.  The Design VP also
required Dineley to meet with her each morning to review the
day's schedule and to create an end-of-day report for the Design
VP's review.  Dineley felt that the Design VP "micro-managed" her
work.

On October 6, 2014, the plaintiff informed the Design VP
that she needed to take a medical leave of absence to seek
inpatient treatment for alcoholism.  This was the first time she
informed anyone at Coach about her alcoholism, and the first time
she requested any accommodation from Coach related to this issue.
The Design VP granted Dineley's request for leave.  After

interviewing and recommending a temporary replacement, Dineley
began her leave of absence on October 12.

Dineley returned to work on November 16.  Dineley returned
to the same position supporting the Design VP and with the same
salary and benefits.  Beginning in mid-December, Dineley asked
the Design VP for permission to leave the office by 6:00 p.m.
four days a week in order to attend outpatient treatment
services.  The Design VP granted Dineley's request.  In March
2015, Dineley's outpatient schedule was reduced to two days a
week, for which she asked and was granted permission to leave the
office by 6:00 p.m.  The Design VP continued to require Dineley
to notify her when she was leaving the office for the day,
including during meetings with top executives, but did not
require her to state the reason.

According to Dineley, after she returned to work from her
leave of absence, the Design VP subjected her to "general
mistreatment" and was "nasty to her all the time."  It was as
though the Design VP "suddenly just decided she didn't like
[Dineley] anymore and wanted to make [her] as uncomfortable as
possible."  While Dineley acknowledges that the Design VP was
difficult to work for before she took leave, she asserts that the
Design VP's mistreatment of her increased after the leave.
According to Dineley, the Design VP would frequently "criticize
and yell at [her]."  According to Dineley, "it started happening
a couple times a week [and] [a]s time went on, it became more and

7

more frequent until toward the end it was basically like
[Dineley] couldn't ever do anything right in her eyes and she
made that very clear."  The Design VP said things to Dineley such
as, "Are you okay?"; "Is everything all right"; Is there anything
going on with you?"; and "You're letting everything fall apart."
Dineley also alleges that the Design VP once called her "stupid."
Dineley reports that the day after an evening for which she had
to leave early for treatment, she addressed the Design VP to the
effect of "Oh, I hope you weren't here too late last night," to
which the Design VP responded by saying, "Yes, we were here very
late.  A lot of people have to work late at night.  They don't
all get to leave early like you."  On another occasion the Design
VP told her "this isn't a 9 to 5 job."  According to Dineley,
these types of comments were "never" made to her before the
leave, and they were made in a condescending tone.  Dineley
understood all of these comments to be in relation to her leave
of absence, need for accommodation, and substance abuse problems
based upon "[t]he way she said it to [Dineley] . . . [her] tone,
her body language, [and] the way she looked at [Dineley] while
she said it."  For example, Dineley believes that when the Design
VP asked if everything was all right, she was implying that
Dineley was drinking again.  When the Design VP mentioned
personal issues, Dineley believes she was referring to her
addiction issues and need for accomodation.

     On August 21, 2015, the Design VP gave Dineley her annual

performance evaluation with an overall rating of "solid performance."  During Dineley's 2015 performance review the Design VP purportedly said "you have a lot of personal issues and who knows how much of that has had an effect on your performance problems."  Dineley viewed this as a poor performance review. That day Dineley notified the Design VP of her intent to resign.

During her final two weeks, Dineley participated in an exit interview.  She stated that she was resigning because she was dissatisfied with her 2015 performance review and because she no longer wanted to work for the Design VP.  Dineley's employment at Coach ended two weeks later on September 4, 2015.

## DISCUSSION

Defendants move for summary judgment as to Dineley's claims for overtime pay and for discrimination on the basis of disability.  Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co.

9

v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).  If the moving party makes this initial showing, the burden then shifts to the opposing party to establish a genuine dispute of material fact. El-Nahal v. Yassky, 835 F.3d 248, 256 (2d Cir. 2016).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in [Rule 56], must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  The court must draw all inferences and all ambiguities in a light most favorable to the nonmoving party.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  In cases involving claims of

employment discrimination there is a "need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015) (citation omitted).

A.    Administrative Exemption

The Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219, protects "the minimum standard of living necessary for health, efficiency, and general well-being of workers." Id. § 202(a).[3]  The FLSA generally provides that employees be paid time-and-a-half for hours worked in excess of forty in a week.  Id. § 207(a)(1).  Specific classes of employees, however, are exempted from this general provision.  Id. § 213(a).[4] "Because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed. . . .  Accordingly, an employer bears the

---

[3] The NYLL explicitly incorporates certain provisions of the FLSA, and thus similar analyses govern both the federal law and state law claims here.  See, e.g., Zheng v. Liberty Apparel Co., 355 F.3d 61, 78 (2d Cir. 2003).  For simplicity, this Opinion proceeds by discussing the FLSA only.

[4] The NYLL's administrative employee exemption is interpreted similarly to the FLSA exemption, except that: (1) the minimum salary required to qualify for the exemption is $675 per week; (2) the employee is required to "customarily and regularly" exercise discretion and independent judgment (but not with respect to "matters of significance"); and (3) an employee must "regularly and directly assist[] an employer, or an employee employed in a bona fide executive or administrative capacity (e.g., employment as an administrative assistant), or . . . perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge."  12 NYCRR § 142-2.14.

burden of proving that its employees fall within an exempted
category of the [FLSA]." Ramos v. Baldor Specialty Foods, Inc.,
687 F.3d 554, 558 (2d Cir. 2012) (citation omitted).

"The exemption question under the FLSA is a mixed question
of law and fact.  The question of how the employees spent their
working time is a question of fact.  The question of whether
their particular activities excluded them from the overtime
benefits of the FLSA is a question of law." Pippins v. KPMG,
LLP, 759 F.3d 235, 239 (2d Cir. 2014) (citation omitted).
Although the level of discretion that Dineley exercised in her
day-to-day activities is disputed in part, based on what is not
in dispute and viewing the evidence in the light most favorable
to Dineley, the activities in which Dineley engaged made her an
exempt employee as a matter of law.

The administrative exemption under the FLSA applies to
employees "employed in a bona fide executive [or]
administrative . . . capacity."  29 U.S.C. § 213(a)(1).[5]  This
applies to:

> any employee: (1) Compensated on a salary or fee basis
> at a rate of not less than $455 per week . . . ;
> (2) Whose primary duty is the performance of office or
> non-manual work directly related to the management or
> general business operations of the employer or the

---

[5] Coach argues that Dineley was also an exempt employee under the
executive exemption when she worked in the Design Department.
This exemption requires that the employee's "primary duty is
managing the enterprise, or managing a customarily recognized
department or subdivision of the enterprise."  29 C.F.R.
§ 541.100.  The issue need not be decided, as Dineley is an
exempt employee under the administrative exemption.

> employer's customers; and (3) Whose primary duty
> includes the exercise of discretion and independent
> judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  Coach bears the burden of showing that

all three elements are satisfied.  Ramos, 687 F.3d at 558.

Dineley does not dispute that her work at Coach satisfies the

first and second factors, but disputes that the third element has

been met.

"In general, the exercise of discretion and independent

judgment involves the comparison and the evaluation of possible

courses of conduct, and acting or making a decision after the

various possibilities have been considered."  29 C.F.R.

§ 541.202(a).  "The exercise of discretion and independent

judgment must be more than the use of skill in applying well-

established techniques, procedures or specific standards

described in manuals or other sources."  Id. § 541.202(e).  The

factors to be considered in whether an employee exercises

discretion and independent judgment include, but are not limited

to, the following:

> whether the employee has authority to formulate,
> affect, interpret, or implement management policies or
> operating practices; whether the employee carries out
> major assignments in conducting the operations of the
> business; whether the employee performs work that
> affects business operations to a substantial degree,
> even if the employee's assignments are related to
> operation of a particular segment of the business;
> whether the employee has authority to commit the
> employer in matters that have significant financial
> impact; whether the employee has authority to waive or
> deviate from established policies and procedures
> without prior approval; whether the employee has
> authority to negotiate and bind the company on

13

> significant matters; whether the employee provides
> consultation or expert advice to management; whether
> the employee is involved in planning long- or short-
> term business objectives; whether the employee
> investigates and resolves matters of significance on
> behalf of management; and whether the employee
> represents the company in handling complaints,
> arbitrating disputes or resolving grievances.

In re Novartis Wage & Hour Litig., 611 F.3d 141, 155 (2d Cir.
2010) (quoting 29 C.F.R. § 541.202(b)).

"An executive assistant or administrative assistant to a
business owner or senior executive of a large business generally
meets the duties requirements for the administrative exemption if
such employee, without specific instructions or prescribed
procedures, has been delegated authority regarding matters of
significance."  29 C.F.R. § 541.203.  "The term 'matters of
significance' refers to the level of importance or consequence of
the work performed."  Id. § 541.202(a).

An employee's "primary duty" depends on such factors as "the
relative importance of the exempt duties as compared with other
types of duties; the amount of time spent performing exempt work;
the employee's relative freedom from direct supervision; and the
relationship between the employee's salary and the wages paid to
other employees for the kind of nonexempt work performed by the
employee."  29 C.F.R. § 541.700(a).  The amount of time an
employee spends performing exempt work, as opposed to nonexempt
work, is a "useful guide in determining whether exempt work is
the primary duty of the employee," but "[t]ime alone ... is not
the sole test."  Id.

A reasonable jury could only conclude that Dineley's primary duties required the exercise of discretion and independent judgment on matters of significance to such an extent that she qualified for the administrative exemption to the laws requiring overtime pay.  Dineley was paid a salary that was commensurate with her level of experience and responsibilities.  Her salary was approximately double that of the non-exempt administrative assistants over whom she shared supervisory responsibilities.

Dineley directly supported high level executives within a large company of approximately 17,000 people, the type of position explicitly contemplated in the regulations.  She first worked for the second most senior member of Coach's HR department.  Her work in HR required constant exercise of judgment.  Dineley also trained new assistants and "on-boarded" them when they joined Coach.  Dineley next directly supported the Design VP, the second most senior executive in the Design Department.  Again, her primary duties required the exercise of discretion and judgment regarding matters of significance.  She was also the person given primary responsibility for supervising and delegating work to two administrative assistants in the Design Department.  Further, she interviewed applicants for administrative and executive assistant positions, including one of the assistants she supervised, and made recommendations on who should be hired.  Because nothing in the record, when viewed in the light most favorable to Dineley, raises a triable issue of

15

fact as to whether Dineley's primary duties included the exercise of discretion and independent judgment with respect to matters of significance, Coach has shown that it is entitled to a determination that the administrative exemptions to the FLSA and NYLL applied to Dineley.

B.   Hostile Work Environment

Dineley asserts that she was subjected to a hostile work environment because of disability in violation of the ADA and NYCHRL.  The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).[6]  Whether the ADA provides a basis for a hostile work environment claim has not yet been decided by the Second Circuit, although it has been recognized in other circuits.  See Shaver v. Indep. Stave Co., 350 F.3d 716, 719 (8th Cir. 2003); Flowers v. S. Reg'l Physician

---

[6] The NYCHRL similarly prohibits employment discrimination based on the actual or perceived disability of any person.  N.Y.C. Admin. Code § 8-107(1)(a).  NYCHRL discrimination claims must be analyzed "separately and independently from any federal and state law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible."  Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 75 (2d Cir. 2015) (citation omitted). To establish a hostile work environment for NYCHRL claims, a plaintiff need not meet the "severe and pervasive" standard, and instead need only prove the "differential treatment -- that she is treated 'less well' -- because of a discriminatory intent." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013).  Because summary judgment is denied under the stricter federal standard, it is also denied under the NYCHRL.

Servs. Inc., 247 F.3d 229, 232-33 (5th Cir. 2001); Fox v. Gen.
Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001).[7]  The ADA
includes the same critical phrase as Title VII, which prohibits
discrimination as to the "terms, conditions, and privileges of
employment."  The Second Circuit has held that this phrase
"evinces a congressional intent to strike at the entire spectrum
of disparate treatment, which includes requiring people to work
in a discriminatorily hostile or abusive environment."
Littlejohn v. City of N.Y., 795 F.3d 297, 320 (2d Cir. 2015)
(citation omitted).  Moreover, as the Second Circuit has
recognized, while hostile work environment doctrine is "most
often encountered in connection with actions asserting Title VII
violations, its application is by no means limited to that
context."  Gonzalez v. Hasty, 802 F.3d 212, 220 (2d Cir. 2015).
Accordingly, this Opinion will proceed on the assumption that a
hostile work environment claim is cognizable under the ADA.

> In order to prevail on a hostile work environment
> claim, a plaintiff must make two showings: (1) that the
> harassment was sufficiently severe or pervasive to
> alter the conditions of the victim's employment and
> create an abusive working environment and (2) that
> there is a specific basis for imputing the conduct
> creating the hostile work environment to the employer.

Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013).

---

[7] Several other circuits have assumed without deciding that such
a cause of action exists.  See Mannie v. Potter, 394 F.3d 977,
982 (7th Cir. 2005); Rivera-Rodriguez v. Frito Lay Snacks
Caribbean, 265 F.3d 15, 23 (1st Cir. 2001); Walton v. Mental
Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 666-67 (3d Cir.
1999); Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir.
1998).

[A] plaintiff must show that the workplace is permeated
with discriminatory intimidation, ridicule, and insult
that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an
abusive working environment.  This standard has both
objective and subjective components:  the conduct
complained of must be severe or pervasive enough that a
reasonable person would find it hostile or abusive, and
the victim must subjectively perceive the work
environment to be abusive.  The incidents complained of
must be more than episodic; they must be sufficiently
continuous and concerted in order to be deemed
pervasive.  In determining whether a plaintiff suffered
a hostile work environment, we must consider the
totality of the circumstances, including the frequency
of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably
interferes with an employee's work performance.

Littlejohn, 795 F.3d at 320-21 (citation omitted).[8]  "It is

axiomatic that the plaintiff also must show that the hostile

conduct occurred because of a protected characteristic."  Tolbert

v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).

Summary judgment is denied as to Dineley's hostile work

environment claim.  Dineley identifies her disability as

addiction to alcohol.  The NYSHRL and ADA treat alcoholism as an

impairment that can form the basis of a disability discrimination

suit.  Makinen v. City of N.Y., No. 16-1080-CV, 2017 WL 2218716,

at *2 (2d Cir. May 22, 2017).  The parties do not dispute that

Dineley has a disability.  Viewing the evidence in the light most

favorably to Dineley, she has offered evidence that a jury could

find demonstrates that the Design VP's mistreatment of her after

---

[8] Again, the more lenient NYCHRL standard requires only that the
plaintiff "show that she has been treated less well" because of
her protected characteristic.  Mihalik, 715 F.3d at 110.

she took a disability leave in October 2014 was pervasive, and
that it was because of her disability, or need for accommodation
because of her disability.  Dineley avers that comments relating
to her disability were made repeatedly, and that this conduct
began only after she took leave to attend rehabilitation.
Ultimately, a jury must decide what comments were made by the
Design VP, whether they were motivated by knowledge of Dineley's
disability and need for treatment, and whether they were
sufficiently pervasive to create a hostile work environment.

    C.    <u>Constructive Discharge</u>

    "Where an alleged constructive discharge stems from an
alleged hostile work environment, a plaintiff must show working
conditions so intolerable that a reasonable person would have
felt compelled to resign." <u>Fincher v. Depository Trust &
Clearing Corp.</u>, 604 F.3d 712, 725 (2d Cir. 2010) (citation
omitted).  A hostile-environment constructive discharge is a
"<u>graver</u> claim . . . than its lesser included component, hostile
work environment." <u>Pennsylvania State Police v. Suders</u>, 542 U.S.
129, 149 (2004).  "[C]onstructive discharge is a claim distinct
from the underlying discriminatory act." <u>Green v. Brennan</u>, 136
S. Ct. 1769, 1779 (2016).  The analysis of a constructive
discharge claim "generally focuses on . . . the employer's
intentional conduct and the intolerable level of the work
conditions." <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 229 (2d Cir.

2004).[9]  Whether the employee's work conditions were so intolerable as to compel resignation "is assessed objectively by reference to a reasonable person in the employee's position." Id. at 230.  "[I]f a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely negligent or ineffective." Id. at 229-30 (citation omitted).  In several instances, the Second Circuit has found issues of fact as to a hostile work environment claim, while granting summary judgment as to a constructive discharge claim due to a lack of deliberate employer action.  See id. at 230-31; Mack v. Otis Elevator Co., 326 F.3d 116, 123, 128 (2d Cir. 2003); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71, 73-74 (2d Cir. 2000).

Summary judgment is granted with respect to Dineley's constructive discharge claim.  Dineley has failed to offer evidence that would permit a jury to find that her working conditions, viewed in the light most favorable to Dineley, were so intolerable person that a reasonable person would feel compelled to resign.  She has also failed to offer evidence of conduct by the Design VP from which a jury could conclude that

---

[9] The standard for constructive discharge under the NYCHRL is similar to the federal standard.  Under the NYCHRL, a plaintiff must demonstrate that an employer "deliberately creat[ed] working conditions that were so intolerable that a reasonable person would have felt compelled to resign." Teran v. JetBlue Airways Corp., 18 N.Y.S.3d 25, 27 (App. Div. 2015) (citation omitted).

supervisor acted deliberately to force Dineley's resignation. Dineley has not met her burden to demonstrate a constructive discharge.

Dineley relies primarily on Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81 (2d Cir. 1996), to support her constructive discharge theory.  This comparison is not apt.  In Chertkova, summary judgment was inappropriate for the constructive discharge gender discrimination claim because: (1) the plaintiff's male supervisor and his boss yelled insults at the plaintiff, including: "What do you hope for?  Do you think you are going to outlive us?  There is no chance!  You are not going to be here!"; (2) the plaintiff was told she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels, demonstrate satisfactory behavior, and improve her listening skills, which might be viewed as using her undoubted technical competence at work so long as she only listened and never spoke; and (3) the plaintiff had a nervous breakdown during this time causing her to leave work.  Id. at 89-90.  All of this evinces far more severe workplace misconduct and a direct intent to force a resignation, evidence that is entirely lacking in this case.

## CONCLUSION

Coach's motion for summary judgment is granted in part. Dineley was exempt from the overtime provisions of the FLSA and NYLL under the administrative exemption.  Summary judgment is

also granted on Dineley's constructive discharge claim.  Triable

issues of fact remain as to Dineley's claim of hostile work

environment discrimination under the ADA and NYCHRL.

Dated:    New York, New York
          July 11, 2017

_____
DENISE COTE
United States District Judge